Willie YOUNG (94–A–7734), Petitioner,

v.

Charles GREINER, Superintendent
of Green Haven Correctional
Facility, Respondent.

Nos. 01–CV–6490 (JBW), 03–
MISC–0066 (JBW).

United States District Court,
E.D. New York.

Oct. 23, 2003.

Willie Young, Stormville, NY, pro se.

Jane Meyers, The Office of the District Attorney, Kings County, Brooklyn, NY, for Respondent.

### MEMORANDUM, JUDGMENT & ORDER

WEINSTEIN, Senior District Judge.

The petition for a writ of habeas corpus is denied. No hearing on this matter is necessary. This memorandum briefly addresses petitioner's claims.

### I. Facts and Procedural History

Petitioner was tried and convicted for the murders of a four year old boy and a six year old girl.

The following recitation of the facts of the case is taken largely from the trial court's written decision denying petitioner's motion to vacate judgment.

On December 3, 1993, the bodies of a male child and a female child were found hanged in an apartment in Brooklyn. In addition to being hanged the male child was also stabbed. The stabbed mother of the male child was also found inside the apartment.

While being transported to the hospital, the mother apparently identified a person by the name of "Toby" as the perpetrator. Petitioner is not known as "Toby." Thereafter, during interviews with police officers in the hospital over the next couple of days, the mother stated that she had killed the children and stabbed herself. The mother gave different reasons for the killings. During some of the police interviews, the mother denied any recollection of the events.

On the day of the incident, petitioner's sister informed petitioner (a stepbrother of the mother) that the mother was recovering from her injuries. When petitioner heard this, he stated "I can't stay here" and then "I got to go, I got to go."

After a week of inculpatory statements by the mother to the police, the mother's boyfriend obtained counsel for the mother. At this time, the mother for the first time informed law enforcement agents that it was petitioner who committed the crime. The mother was subsequently indicted for murder.

The police tried to interview the petitioner but could not locate him. Finally, the petitioner contacted the police. In his first interview petitioner denied knowledge of the crime and stated that he had been at work at the time of the crime. During later interviews, the petitioner changed his story numerous times. After being told that his fingerprints had been found near the door where the children were hanged, the petitioner stated that he had received a call from the mother requesting that he come to her apartment. Petitioner com-

plied and found the male child lying on a bed. The mother requested that the petitioner rehang the child, which petitioner did. Petitioner then had a conversation with the mother. The mother then stabbed herself. Petitioner told the mother should the police ask who committed the crime, she should tell them that petitioner had committed the crime. Petitioner also stated that he did not see the female child. (Others who had entered the premises who saw the male child hanging on the door also did not see the female child.) Petitioner then took some incriminating evidence and disposed of it. As a result of this statement, petitioner was indicted for hindering prosecution.

After a conversation with the medical examiner, the People decided to seek a homicide indictment against the petitioner. The medical examiner had told the prosecutor that the child could not have been rehanged as alleged by the petitioner in his last statement to law enforcement.

On September 12, 1994, an indictment charging petitioner with murder was filed. Petitioner was arraigned on that date, and pleaded not guilty. Trial commenced the next day.

The evidence against petitioner consisted of the mother's testimony as to what occurred, the finding of petitioner's fingerprints at the scene of the crime, petitioner's sister conversation with petitioner, the numerous contradictory and false statements made by petitioner, and the medical examiner's testimony as to cause of death and the impossibility of rehanging the male victim.

Petitioner presented testimony regarding the mother's confessions and a medical examiner who testified that the physical evidence was consistent with rehanging. The confessions of the mother were admitted as declarations against penal interest. The jury was instructed that they could consider the mother's confessions for their truth. Petitioner's medical examiner agreed with the People's medical examiner as to cause of death.

On October 4, 1994, the jury convicted petitioner of the homicides. On October 25, 1994, petitioner was sentenced.

On November 23, 1994, the indictment against the mother was dismissed.

Subsequent to trial, petitioner learned of evidence that might tend to impeach the credibility of the state's medical examiner. On August 7, 1993, four-year old Andrew Lauer died. The baby was examined by the same medical examiner who was involved in the present case. As a result of the examination, the medical examiner classified the death as a homicide. The police began questioning the baby's mother and father, and informed various neighbors about the alleged homicide. On August 31, 1993, the medical examiner and another member of the Office of the Chief Medical Examiner (OCME) examined the brain of the child and determined that baby Lauer had died of natural causes. The medical examiner never informed any law enforcement agent that the death was from natural causes, so that the police continued to question and suspect the parents of the homicide. The police investigation caused damage to the Lauer's marriage and relations with their neighbors.

Finally in 1995 after a series of articles in the newspapers, the medical examiner changed the Lauer death certificate from homicide to natural causes. The medical examiner involved in the instant case ultimately resigned as a result of the *Lauer* matter.

Petitioner was sentenced to 50 years to life in prison. His conviction was affirmed by the Appellate Division. Leave to appeal to the New York Court of Appeals was denied.

Petitioner moved in the trial court to vacate judgment, alleging a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), with respect to the prosecution is failure to inform the defense that the state's medical examiner had committed an error in the *Lauer* case. The motion was denied. Leave to appeal to the Appellate Division was denied.

In his application for a writ of habeas corpus, petitioner claims that (1) he was denied *Brady* material because the prosecution did not disclose information to the defense concerning the medical examiner's actions in connection with an autopsy performed in another case; (2) the trial court erroneously failed to charge the jury that Darlene Hoyt, the victims' mother was an accomplice as a matter of law; and (3) the trial court erroneously failed to issue a "cautionary instruction" concerning the jury evaluation of the testimony of Hôyt.

Without seeking to amend his application, petitioner raises several additional issues in his Memorandum of Law in support of his application: (1) that the trial court delegated a judicial function to the jury to determine if the admissions of Hoyt were declarations against penal interest, and that the judge's charge on this score denied petitioner due process; (2) that he was denied his right to meaningful notice of a grand jury appearance; and (3) that the verdict was against the weight of the evidence. The application is deemed amended to include these contentions.

## II. AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman,* 261 F.3d 303, 313 (2d Cir.2001) (quoting *Aycox v. Lytle,* 196 F.3d 1174, 1178 (10th Cir.1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

■ "[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton*, 295 F.3d 270, 278 (2d Cir.2002); *see also Yung v. Walker*, 341 F.3d 104 (2d Cir.2003) (amended opinion) (district court's habeas decision that relied on precedent from the court of appeals is remanded for reconsideration in light of "the more general teachings" of Supreme Court decisions). The Court of Appeals for the Second Circuit has also indicated that habeas relief may be granted if a state court's decision was contrary to or an unreasonable application of "a reasonable extension" of Supreme Court jurisprudence. *Torres v. Berbary*, 340 F.3d 63, 72 (2d Cir.2003). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III. Exhaustion

In the past, a state prisoner's federal habeas petition had to be dismissed if the prisoner did not exhaust available state remedies as to any of his federal claims. *See Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). "This exhaustion requirement is ... grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The exhaustion requirement requires the petitioner to have presented to the state court "both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir.1982) (en banc).

Pursuant to AEDPA, a district court may now, in its discretion, *deny* on the merits habeas petitions containing unexhausted claims—so-called "mixed petitions." *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."). In addition, the state may waive the exhaustion requirement, but a "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." *Id.* § 2254(b)(3); *see also Ramos v. Keane*, No. 98 CIV. 1604, 2000 WL 12142, *2, 2000 U.S. Dist. LEXIS 101, at *10 (S.D.N.Y.2000) (state's failure to raise exhaustion requirement does not waive the issue).

## IV. Procedural Bar

■ A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750, 111 S.Ct. 2546. In determining whether a procedural bar is sufficient to preclude habeas review, a federal court must consider as "guideposts" the following:

(1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially

340

complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest. *Cotto v. Herbert,* 331 F.3d 217, 240 (2d Cir.2003) (quoting *Lee v. Kemna,* 534 U.S. 362, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002)).

■ If a state court holding contains a plain statement that a claim is procedurally barred then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. *See Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision).

■ When a state court says that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, such a claim is not preserved. *See Glenn v. Bartlett,* 98 F.3d 721, 724–25 (2d Cir.1996). When a state court "uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama v. Comm'r of Corr. Svcs.,* 235 F.3d 804, 810 (2d Cir. 2000). Where "a state court's ruling does not make clear whether a claim was rejected for procedural or substantive reasons and where the record does not otherwise preclude the possibility that the claim was denied on procedural grounds, AEDPA deference is not given, because we cannot say that the state court's decision was on the merits." *Su v. Filion,* 335 F.3d 119, 126, n. 3 (2d Cir.2003) (citing *Miranda v. Bennett,* 322 F.3d 171, 178 (2d Cir.2003)). This congeries of holdings leaves it an open question whether there are "situations in which, because of uncertainty as to what the state courts have held, no proce-dural bar exists and yet no AEDPA deference is required." *Id.*

## V. Certificate of Appealability

■ A certificate of appealability may be granted with respect to any one of petitioner's claims only if petitioner can make a substantial showing of the denial of a constitutional right. **Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit.** *See* 28 U.S.C. § 2253; *Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). The court has taken into account the rule of section 2253(c)(3) of Title 28 of the United States Code that a certificate of appealability "shall indicate which specific issue or issues satisfy the [substantial showing of the denial of a constitutional right] required by paragraph (2)." *See also Shabazz v. Artuz,* 336 F.3d 154, 160 (2d Cir. 2003).

This opinion complies with *Miranda v. Bennett,* 322 F.3d 171, 175–77 (2d Cir. 2003), and Rule 52 of the Federal Rules of Civil Procedure.

## VI. Analysis of Claims

All of petitioner's claims appear to have been exhausted. Some appear barred from review in this court on procedural grounds. Because petitioner's claims are meritless under any standard of review, unless otherwise noted the claims are reviewed below under a *de novo* standard.

### A

■ Petitioner first claims that he was denied *Brady* material because the prosecution did not disclose information to the defense concerning the medical examiner's actions in connection with an autopsy performed in another case. The prosecution in a criminal matter has a constitutional obligation to disclose excul-

patory evidence to the defendant. · *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). "A finding of materiality of the evidence is required under *Brady.*" *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Exculpatory evidence is considered material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Nondisclosure merits relief only if the prosecution's failure " 'undermines confidence in the outcome of the trial.' " *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375). The Supreme Court has rejected any distinction between impeachment evidence and exculpatory evidence. *See Bagley,* 473 U.S. at 676, 105 S.Ct. 3375. Impeachment evidence "is 'evidence favorable to an accused,' *Brady,* 373 U.S. at 87, 83 S.Ct. 1194, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Id.* The "individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles,* 514 U.S. at 437, 115 S.Ct. 1555; *see also Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (assuming that state child protective agency files could be *Brady* material).

Petitioner's *Brady* claim was rejected on the merits by the trial court when it denied petitioner's motion to vacate judgment. In doing so, however, the court felt compelled to rely on state court precedent establishing that, for *Brady* purposes, knowledge of information in possession of the state medical examiner is not imputed to the prosecutor. *Cf. Kyles v. Whitley,* 514 U.S. 419, 437–38, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (knowledge of exculpatory or impeachment information in possession of police is imputed to the prosecution). The trial court explained its reasoning in a written decision:

The Appellate Division, First Department, has ruled that material in the possession of the OCME is not legally deemed to be in the possession of the prosecution for *Brady* purposes (*People v. Stern,* 270 A.D.2d 118, 704 N.Y.S.2d 569; *People v. Wright,* 225 A.D.2d 430, 639 N.Y.S.2d 361). In absence of a decision by any other department of the Appellate Division, this court is mandated to follow the decision of the Appellate Division, First Department (*Mountain View Coach v. Storms,* 102 A.D.2d 663, 664–665, 476 N.Y.S.2d 918).

The motion is denied.

Notwithstanding that this court is bound by the decisions of the Appellate Division, First Department, the court has the First Amendment right to express its disagreement with those decisions and urge other institutionally higher courts not to follow the decision of the Appellate Division, First Department (*see, People v. James,* 111 A.D.2d 254, 256, 489 N.Y.S.2d 527, Titone, J. concurring).

Under the Appellate Division, First Department's decisions if OCME had information (as was the case ·in· the *Lauer* case) that death of the victim was natural rather than homicidal, the suppression of such information would not constitute a *Brady* violation. This court has grave reservations that the suppression by OCME of critical exculpatory evidence would not require reversal un-

der the Due Process clause of the Federal Constitution.

. . . . .

This court would hold, if not for stare decisis, that in an appropriate case, the People have an obligation to learn of certain favorable information that is in the possession of OCME.

Nothing in this decision should be read as implying that the People had an obligation to learn about the *Lauer* case, or that the material claimed to be exculpatory is "material" in a constitutional sense. This decision should not be read as holding the defendant's papers are sufficient to make out a prima facie claim. [Fn: The papers do not contain any affidavit of a person with actual knowledge of the events in the Lauer case. The Lauer case never went to trial and what, if anything, the medical examiner did was never established.] Much of defendant's moving papers are speculative and hyperbole. [Footnote omitted.] It is noted that both the People's and defendant's medical examiners agreed as to cause of death, but only disagreed as to whether a rehanging could or could not have occurred. The Lauer case does not involve a rehanging issue.

This court holds that under stare decisis principles the motion must be denied. Nov. 13, 200 Decision & Order at 6–10. This court too is doubtful that, as a general proposition, knowledge of exculpatory information in possession of the state medical examiner should not be imputed to the prosecution pursuant to *Kyles*. It is an interesting question that need not be resolved in the instant case.

■ First, even assuming that knowledge of impeachment evidence in possession of the Office of the Chief Medical Examiner should be imputed to the prosecution, it is unreasonable to engage in such a presumption where the impeachment evidence is in the sole and exclusive possession of the government witness testifying at trial. In the instant case, petitioner contends that the prosecution was responsible for revealing to the defense, during trial in September 1994, that Dr. Eddy Lilavois conducted an autopsy in October 1993 and improperly failed to apprise the district attorney of the results of that autopsy. Because Dr. Lilavois's alleged misconduct was not publicly disclosed until April or May 1995, the only way in which the prosecution could have discovered the impeachment evidence at the time of trial would have been for Dr. Lilavois to volunteer to impeach himself. At least where the impeachment evidence (1) relates to a state actor testifying as an expert witness in a case, (2) does not directly concern any testimony offered by the witness, and (3) is actually unknown to the prosecutor and remains in the sole possession of the witness, neither *Brady* nor *Kyles* can reasonably be understood to lay upon the prosecution a duty to turn over such evidence to the defendant. *Cf. People v. Irvin*, 180 A.D.2d 753, 580 N.Y.S.2d 388, 390 (1992) ("While the false testimony [a state forensic scientist] gave about his educational background might have affected the jury's assessment of his credibility, there is nothing in the record indicating that the prosecution was aware, or should be charged with knowledge that he was misrepresenting his credentials."); *United States v. Rosner*, 516 F.2d 269, 279 (2d Cir.1975) ("Perjury by a Government witness, unknown to the prosecution, does not ordinarily compel the application of standards for a new trial required in cases of Government misconduct.").

Second, the impeachment evidence petitioner complains was withheld from the defense was not material in the *Brady* sense. Although Dr. Lilavois's credibility might have been undermined somewhat by his behavior in the *Lauer* case, there is no

reasonable probability that the outcome of the instant case would have been different if the defense had been able to impeach him with that evidence. The circumstances surrounding Dr. Lilavois's alleged improprieties are different in kind from those of the now-infamous Fred Zain and Joyce Gilchrist, two crime laboratory chemists in other states who deliberately and repeatedly falsified test results in order to secure convictions. No such malfeasance is alleged in the instant case.

Petitioner urges only that Dr. Lilavois may have been mistaken in concluding that the male victim in the instant case was not hanged postmortem, and that he refused to budge from that conclusion because doing so might have cast a light on his work in the *Lauer* case. Aside from the fact that both the *Lauer* and the instant cases involved autopsies on children, they have little in common. Dr. Lilavois's conduct in the *Lauer* case was arguably negligent not due to his medical competency or because he acted in any way nefariously; rather his negligence was due to his failure to meticulously prepare and disseminate his reports. There is no reasonable probability that the jury would have rejected Dr. Lilavois's expert testimony altogether or that it ultimately would have reached a different verdict. Habeas corpus relief on this ground is not warranted.

### B

 Petitioner claims that the trial court erroneously failed to charge the jury that Hoyt was an accomplice as a matter of law and that the trial court erroneously failed to issue a "cautionary instruction" concerning the jury evaluation of her testimony. *See* N.Y.Crim. Pro. Law § 60.22(1) ("A defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense."). "In order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law." *Casillas v. Scully,* 769 F.2d 60, 63 (2d Cir.1985). In weighing the prejudice from an allegedly improper charge, a reviewing court must view the instruction in its total context. *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). The question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 147, 94 S.Ct. 396. There is no constitutional or federal accomplice corroboration requirement. *See, e.g., Caminetti v. United States,* 242 U.S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442 (1917).

Petitioner complains that the trial court did not charge that Hoyt was petitioner's accomplice as a matter of law. The court did charge that the jury was to determine whether Hoyt was an accomplice, and that if it found she was an accomplice the jury was to determine whether there was corroboration of her testimony. There appears to have been no error with this charge. Even if Hoyt was an accomplice as a matter of law based upon the fact that she too was indicted for the murder of her children, any error was harmless because there was substantial corroboration of her testimony inculpating petitioner. Fingerprint and palm print evidence, petitioner's conflicting and changing stories, and forensics evidence all tended to establish petitioner's guilt and corroborate Hoyt's testimony. Petitioner was not denied a fair trial. Habeas corpus relief on this ground is not warranted.

### C

 Petitioner claims that the trial court delegated a judicial function to the

jury to determine if the admissions of petitioner's sister were declarations against penal interest and that the judge's charge on this score denied him due process. This claim was rejected by the Appellate Division on procedural grounds because it was not preserved with a contemporaneous objection. Review of the record demonstrates that that ground was independent and adequate under the instant circumstances. Review is thus precluded in this court.

At any rate, the Appellate Division held in the alternative that the claim was meritless, stating that "the jury, hearing the whole charge, would have gathered from its language the correct rules to apply in arriving at its verdict; none of the asserted imperfections were such as to warrant reversal of the defendant's conviction." *People v. Young*, 262 A.D.2d 340, 689 N.Y.S.2d 644 (App.Div.1999). That conclusion seems reasonable, although the trial court's charge in this respect was convoluted and confusing, and should not have been put to the jurors at all. Simply put, the jurors should have been told by the trial court whether the statements made by Darlene Hoyt could or could not be used as direct evidence in the case, and whether their use could be considered only for their impeachment value. The instruction was as follows:

Now, usually speaking, the only evidence that you can consider as what we call evidence in chief is testimony that either comes from the witnesses on the stand, exhibits, or from stipulations. So if something was said earlier, it doesn't meet that test, but it is permitted so that you can evaluate their in-court testimony and that is what the rule is on that. So you have various steps you have to take.

First, you have to decide whether or not the prior statements were in fact inconsistent. That is a question for you, the jury, to decide with this trial testimony. Now, if you then find that they were inconsistent, then you must then use that to evaluate their in-court testimony. In other words, if you are satisfied that the prior statements were inconsistent with the testimony here, that fact of their being inconsistent may be something you wish to consider in reflecting upon or discrediting that witness's testimony as they testified here in court.

Now that is how you do that. However, in this case with the witness Darlene Hoyt there was evidence presented that she on certain occasions subsequent to December 23rd, more particularly if my recollection serves me correctly, on the 24th and 26th of December, 1993, made statements while at the hospital.

Now, we have a concept in law called declaration against penal interests. And that is if you find after I charge you as to what you must find in order for you to say that it was a declaration against penal interests, if you find that her statements are indeed under the criteria that I outlined to you, the declaration against penal interests, then that, even though you may use the statement as a inconsistent statement, if indeed you find it to be inconsistent with their in-court testimony as a form of evaluation, but in addition if you find it was a declaration against penal interests, you could use it as evidence in chief the same as if it was evidence here at the trial falling into the criteria of either testimonial exhibits or stipulated testimony. You understand?

Now, the law goes on and says that based upon her testimony that she has no memory. That is, you are the judges of the facts; but if you find that to be a fact that she said she had no memory as to both—the events of December 23rd she only had limited memory. She said her memory was up to a certain point

and then she testified here that she had no memory as to the statements that she made on December 24th and 26th of 1993 and if you find that to be so based upon what you heard. Therefore, she was not available to be cross-examined on the events or the statements because when she was asked questions about that, she said that she could not remember either the events of December 23rd or making the statements on the 24th or the 26th.

Now, that all came out as to what those statements were through the testimony of police officers that were called here to the stand. So you must first determine whether or not the alleged statements were in fact made by her because you are the judges of the facts and it is for you and you alone to determine whether or not Darlene Hoyt did or did not make such statements, because she says she has no memory of it. Remember she said that she didn't remember. So now there is testimony that goes in, each of these police officers are called and so forth. And you also heard a tape which I believe is Exhibit 16 in evidence which is the interview with Assistant District Attorney Bjornaby. So you have to determine from all of this, because you are the triers of the facts, whether indeed these statements were made.

Now, if you find that the statements were not made by Darlene Hoyt, then you have nothing further to do. Of course, you can't consider them because you as the triers of the facts have rejected they were made and you must stop and disregard them as far as evidence in chief as much as you humanly possibly can and just forget them, strike them from your mind. But then on the other hand, if you were to reach the conclusion that they were not made, you would then have to go back as to the inconsistencies. But obviously if you feel that

none of them were made at all, then they can't be used for credibility purposes nor as evidence in chief under this concept of declarations against penal interests; but if you find that they were made, then you go on.

And it will be for you to determine the next step which is the reliability or truthfulness of these statements themselves. Are they reliable and truthful? In deciding whether or not such statements were reliable or truthful, you must consider all of the evidence as to the facts and circumstances surrounding the making of such statements. In making a determination of the reliability and trustworthiness of such illegal statements, you must be satisfied of the following three things: one, you must be satisfied that there is other independent evidence other than the statements themselves which satisfy you that the alleged statements are trustworthy and reliable. In other words, it must be other independent evidence other than the statements themselves which corroborates or which supports the facts asserted to in such declarations.

In making your determination you will consider all of the circumstances under which the statements were allegedly made. Among other things to which you should pay attention is the motivation of Darlene Hoyt. People may lie or dispute the consequences to themselves to exculpate those whom they love or fear or to inculpate those who they hate, or they may lie simply because they are pathological liars.

So you have to take all of this into consideration. People may lie to protect one who is truly implicated in the crime out of some perverted sense of loyalty. The trustworthiness of any statement may be affected by bias, mental illness, sensation seeking, or some other condition or motive, or even the statement

may be the result of an error in perception, memory or language. The possibilities are limited only by the depths of human experience and it is only for you to make the assessment of trustworthiness and weight of Darlene Hoyt's statement.

The second thing you must consider is you must be satisfied that the declarant had firsthand knowledge of the facts underlying her statements. And the third consideration is you must be satisfied that when the statements were made the declarant, Darlene Hoyt, was aware that her statements were clearly adverse to her penal interest and indicated that she herself had participated in or engaged in conduct constituting a crime. In other words, you must be satisfied that at the time the declarations were made by Darlene Hoyt she was fully aware that by making such statements or declarations she was subjecting herself to possible criminal prosecution.

Let me caution you, members of the jury, that in making your assessment of the trustworthiness and reliability of the alleged statements of the declarant Darlene Hoyt, you should carefully review the evidence and determine whether Darlene Hoyt had any motive to lie when these alleged statements were made. This is not to say that those who have no discernible motive to lie always tell the truth, nor does this mean that those who may have had a motive to lie would not the truth. Suffice it to say, it will be for you and you alone to analyze the motives, if any, of the declarant Darlene Hoyt, as well as, the spontaneity of her declarations when they were made. Obviously in making your analysis of the evidence you must consider all of the evidence and circumstances surrounding the making of the declarant's alleged statements.

Finally, if you are satisfied after careful consideration of all of the factors and criteria that you should apply in making your analysis that the alleged declarations of Darlene Hoyt were, in fact, made and if you are satisfied that the statements are, in fact, trustworthy and reliable, you may give the declarant's statements such weight as you deem appropriate in making your final determination of the guilt or innocence of the defendant in this case.

If you are not so satisfied, then you must proceed to determine the guilt or innocence of the defendant after making a full and careful review of all of the other evidence in the case. Let me caution you that if you for any reason, either because of trustworthiness or that you, after examining the testimony of the police officers for credibility reasons or any of the other cautions I gave you, come to the conclusion that this declaration against penal interests does not apply and that you are not going to use the words of the declarant, then you must disregard it and you may only then find this defendant guilty if you find from all of the other evidence in the case that the accusation has been proven beyond a reasonable doubt. You may not in any way use this as evidence in chief if you discard it. You can only use this along with all of the other evidence in the case if you find after examining it through the criterion I have given you that it is, indeed, a declaration against one's penal interests, you could use that in reaching your decision as to whether the People have or have not proven it beyond a reasonable doubt.

Or to say it another way, you could only use this if this be the means of raising a reasonable doubt if you accept it as a declaration against penal interests. If you don't, then you have to disregard it because of whatever reason

you had rejected it and you could then only consider whether the People have proven the guilt beyond a reasonable doubt based upon the other evidence in the case without considering this. I hope that is clear to you.

Trail Tr. at 1343–52.

Although the charge was exceptionally confusing and verbose, petitioner's contention that he was denied a fair trial because of it is unconvincing. The jury was informed, in essence, that it had the responsibility of determining whether Hoyt's statements to police while she was in the hospital were actually made by her and whether they were reliable. If deemed reliable, the jury could use the statements as direct evidence tending, under present circumstances, to exculpate petitioner. Even if the trial court improperly "delegated" to the jury responsibility for deciding whether Hoyt's statements were against her penal interest, petitioner was in no way harmed by the error, since the jury was ultimately asked to perform the task required of it—*i.e.*, to determine whether Hoyt's hospital-bed statements were reliable. Once this factual determination was made, the rest of the court's instruction was in practical terms mere surplusage. Petitioner was not denied a fair trial. Habeas relief on this ground is not warranted.

### D

 Petitioner claims that he was denied his right to meaningful notice of a grand jury appearance. The Fifth Amendment right to a grand jury presentation in felony cases is not applicable to the states. *Alexander v. Louisiana*, 405 U.S. 625, 633, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). "Once a state itself creates such a right, however, due process may prevent it from causing the right to be forfeited in an arbitrary or fundamentally unfair manner." *Michael v. Dalsheim*, No. 90 CV 2959, 1991 WL 99368, *10, 1991 U.S. Dist. LEXIS 7273, at *30 (E.D.N.Y. May 22, 1991). Nonetheless, claims of deficiencies in state grand jury proceedings are generally not cognizable in a habeas corpus proceeding in federal court because any deficiencies have been rendered harmless by conviction at trial by a petit jury assessing petitioner's guilt under a heightened standard of proof. *See Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir.1989). Petitioner was not prejudiced by the alleged failure to provide him notice of all of the charges that the Grand Jury was investigating against him. Habeas corpus relief on this ground is not warranted.

### E

 Petitioner claims that the verdict was against the weight of the evidence. To the degree petitioner claims that his guilt was not proven beyond a reasonable doubt, the relevant question for this court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in a state criminal conviction. *Einaugler v. Supreme Court*, 109 F.3d 836, 840 (2d Cir.1997). To the degree petitioner claims the verdict was against the weight of the evidence, such a claim does not present a federal constitutional issue.

 There was sufficient evidence presented at trial for a reasonable juror to conclude that petitioner was guilty of each element of the crimes for which he was convicted. Petitioner contends that the admissions of his step-sister, the mother of the victims, establish her guilt. This argument was, of course, made to the jury and was rejected. Issues of credibility are for the jury to determine, not a federal court

on determination of a habeas application. Petitioner's inconsistent stories to police and the nature of the wounds to his step-sister both suggest—and a reasonable jury could have found—that it was petitioner rather than the children's mother that committed this crime. Habeas corpus relief is not warranted.

### F

No other issue open to consideration by this court has merit. *See Sumner v. Mata,* 449 U.S. 539, 548, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) ("a court need not elaborate or give reasons for rejecting claims which it regards as frivolous or totally without merit").

VII. Conclusion

The petition for a writ of habeas corpus is denied.

■ No certificate of appealability is granted with respect to any of petitioner's claims, petitioner having made no substantial showing of the denial of a constitutional right.

SO ORDERED.